Having received a communication from this court suggesting that I might want to take a look at the best evidence rule in relation to the issue raised with reference to wiretaps, I'd like to start there if I may. The issue at hand is whether or not the Federal Wiretap Act, which sets up in many ways a unique integrity process, can be avoided, can be obviated, simply by making more than one recording in original plus duplicates and by the government using those tapes that are not within the integrity process as the exclusive source of everything presented at trial. Am I correct that this is normally done or am I incorrect? Was this a unique circumstance where copy was used? Your Honor, I can tell you in looking at the case law, it would appear to be unusual. In looking at Denton, for example, which is cited in my brief. What about in terms of how trials are actually happened, actually happen on the ground? This is the way they happen all the time. It has to be, doesn't it? Judge, I can tell you that it was the first time I saw that issue. Whether that's a failing on my part or not, I don't know, to be honest with you, sir. But I can tell you it's the first time I saw that issue. I think the issue here is one of whether the materials used in court have to be derived from the sealing process. And my position is not that the only thing that can be used is the sealed original. My position is that what is used in court must be sourced from the sealed original. But is there anything in the text of the statute, anything you can find textually that says that this is wrong, that this is improper? Well, respectfully, sir, I think that that is what the text says. I think that that is the dichotomy that exists between subsections one, two, and three. And I would point out for, yes, sir, I will, but I would point out for benefit of the court that even the one circuit court opinion that seems to go against me accepts that that dichotomy exists between sections one and two pertaining to investigation. Yes, sir. Between sections one and two pertaining to investigation and section three, on the other hand, pertaining to that which is used in a court. Your Honor, indulgence for just one second, please. We're not dealing with an unauthorized application or an unauthorized grant here. Everything was authorized. Yes, sir, that's correct. Everything was authorized. It was timely sealed. And in many ways, Your Honor, I believe that this is an issue that is analogous to sealing. Because I, for example, have been involved in proceedings in which sealing occurred late, past the 10-day rule. That's a very different, that's a different issue than the cases on the late sealing. But you're not alleging that there has been a tampering or that the duplicates, and I understand that's not your argument, but you're not alleging that the duplicates are not accurate copies of the, I'll use the term original, which is kind of a misnomer here, but of the original. You're not alleging that. Sir, I have no way to know, because the fact is. But you could have asked. You could have asked. Isn't that the whole purpose of the sealing? If there was an issue about the authenticity or the accuracy of the copies, you ask to have the duplicates that are going to be used, and again, that's not an accurate term, but I'll use that to make it simpler here. You could have asked to have the duplicates that were going to use the trial tested against the sealed original under situations and circumstances that are consistent with the statute, couldn't you? Your Honor, I certainly understand the Court's point, and I say this respectfully. You just answered the question, could you have asked? I could have asked, yes, sir. If there was any issue about the authenticity of the copies. I could have asked, but ultimately, sir, that's not what the statute requires, I would submit respectfully. The statute requires. Well, having returned to that, please show us then the language that you are relying upon with respect to what the statute requires, because speaking only for myself, I can't find it. Your Honor, Section 2517.3 identifies what materials and who may use those materials with reference to courtroom activity. And nothing in that language excludes the use of a copy in the courtroom, does it? Your Honor, I guess the way I would address that point is this. I think the Congress, and I say this respectfully, I think that the Congress had better things to do if they were simply satisfied with the best evidence rule than in 1968 to very specifically articulate these protections, which in fact were based ultimately upon U.S. Supreme Court case law. The point that was made and the intent that was served by what they did here was, on the one hand, to recognize that these materials affect privacy, and on the other hand, to recognize that they are both compelling evidence and that they are extremely fragile. Well, your argument really arises out of the implication that you get by reading duplicate recordings set forth in 2518.8, that language of that sentence that references 2517. You can infer into that what Congress intended was that if you're trying to get a use of a recording, you've got to fall within the authorized and the procedural protections for the use of the recording. And then you use use and you read back into the word duplicate, and you can infer that that means that the sealed tape has to be used in court in order to comply with 2517's incorporation into 2518.8. But that's not really what it says. That's the inference that you're drawing from the statute. Well, your Honor, I would respectfully differ, and I would differ because the conclusion of 2518.8a, which comes after there's been a specific reference to how you use materials in relation to subsections 1 and 2 of 2517, specifically says the presence of the seal provided for by the subsection or a satisfactory explanation for the absence thereof shall be a prerequisite, shall be a prerequisite for the use or disclosure of the contents of any wire. Contents, isn't contents a key word there? That is, it goes to the fact that the seal is necessary if you're going to use the contents, but it does not necessarily mean that you have to use the sealed tape. Why is that an incorrect reading? And that's what Rivera said. Well, sir, again, I want to make sure that I'm being clear with my position. I do differ with Rivera, but my position is not that the only tape that can be used is the sealed one. It's that the sealed one must be the source of the book that contains the transcripts. The sealed one must be the source of any copies that are used in court. The sealed one must be the source of the compilation. If you're saying you have to make a copy, seal it, and then use this either before or after the seal is put on that original, call that tape number one. I hate the term original because here these are really duplicate originals. Yes, Your Honor. Tape number one, the one that's on the primary taping machine, recording machine, that you have to use that recording to then generate any duplicates and to use those duplicates to trial. Is that what you're saying? That's exactly what I'm saying. If that's a less satisfactory procedure than recording three or four or five tapes all simultaneously through the same microphone, you get much less opportunity for tampering and alteration of the tape under the procedure that the government used and the procedure that you're advocating. And it's clear from the language Congress used and from the court's decision in Giordano and the other Supreme Court decision, Chavez, that the intent of Congress is to protect the integrity and the accuracy of these recordings. Judge, I have to differ with that, and I do so respectfully. I don't see integrity in the process of law enforcement agents taking unsealed copies, which are solely within their possession for a very extended period of time, when they are, in fact, witnesses who are there on behalf of the government and having them with no control and using them as the exclusive source for court. But that's, again, exactly my point. If there's a concern that what is on that copy is inconsistent with the sealed copy, then you ask for a comparison to be made, and I think under the statute you're fully entitled to that. And there are ways that you can ensure that what is played in court is a true and accurate copy of the seal. I would imagine even the witness testifying about the copy to lay the foundation for the copy, those questions have to be asked about how the copies or the compilation was generated, whether or not that's a true and accurate and faithful copy of the original. Judge, I understand the court's point, although I would suggest respectfully that ultimately I think it's asking the defense to do the prosecution's job. What we've done here, if we accept the government's position, it said that over there somewhere in a box never to be opened is a sealed tape. Now there's integrity, but let's let law enforcement handle these tapes. The government's job is done at trial if you haven't asked anything up to that point. And if, and I understand you see the statute otherwise, but if there is no language in the statute that explicitly prohibits the use of a, quote, copy, and if then at trial where the rules of evidence are going to determine issues of admissibility, which this becomes at trial, and if, as they certainly are, the rules of evidence regime that we have are rules of admissibility and specifically 1003 permits the admission of copies, why is there any evidence at all here? I'm sorry. Why is there any suggestion at all here that what the government did was anything other than the ordinary course? And beyond that, do you really, really care about this issue when you have an issue of closure that is a part of this case? Issue of closure, sir. I'm sorry. I don't understand. Yeah. The fact, maybe you should go to the next part of your argument, which is the fact that for 16 minutes or an hour, depending on how you look at it, the matter was not broadcast. The speaker being off. The speaker was off. Oh, yes, sir. Yes, sir. I'm sorry. Public access to courts. Your Honor, I see that my time is almost up. I have reserved five minutes for rebuttal. I will certainly make that the primary issue. We'll give you another minute on this. Go ahead. Why don't you tell us. Well, sir, the bottom line with that issue is that it's not inadvertent. Mr. Zitlow, who's a colleague and friend of mine, said on the record that he had done it on purpose, that it was his decision, and he explained in the record why. And I'm not saying it was out of malice, but that he had decided to have it so that the loudspeakers did not broadcast to the room itself. Therefore, what you have, I submit, is a structural error that is not inadvertent. When it was brought to the attention of the court, a good 40 minutes to an hour approximately after it began, and frankly, as soon as I knew, because I'm sitting there in headphones. The Second Circuit in the Peterson case has used a triviality test, that is, where what has been the subject of closure, even an unjustified closure, is trivial, that there's no constitutional violation. That's the Second Circuit's test. It's not ours. Is that something we should consider? And if so, was this a trivial episode? Sir, I think when you have a willful exclusion of public right of access, it's different than if it's inadvertent. But why? Why does the right of public trial, right of access, turn on willfulness as opposed to inadvertence? I mean, the Constitution does not contain that distinction. Where does it come from? Well, certainly, Your Honor, much of the case law is informed by scenarios, situations in which the prosecution, the court, or both are unaware, for example, that the courtroom itself has been locked for a limited period of time. And under those circumstances, it has been found to be acceptable. But I'm saying, if you look at it in terms of the right of access that the public has, the public, and I'm not saying there was a deprivation or denial here, but if the right of access is ceded in the public, then does it matter if that public right of access is denied based upon a willful violation or just a negligent or inadvertent act which resulted in a denial of access? Does it matter for constitutional purposes? I'm just not sure why you're conceding that there's a distinction there. Judge, I see the court's point. If it is a structural error, I suppose it's a structural error. And from the Constitution... It's pretty important if it's a structural error. First of all, if it's a structural error, it completely removes harmless error from our inquiry. Yes, sir. Well, in that case, the court has convinced me. It doesn't really matter if it's inadvertent or something this morning. Yeah, that's right. Let me ask, because to me this is important, and I don't know the answer. I want to understand exactly what happened here. Do I understand that this period of time when the speaker was shut down was not merely the playing of tapes, but that the playing of those tapes occurred coincident with a witness on the stand at all times who would from time to time testify in a preliminary way about what you're about to hear on the tape or in an explanatory way about something that had just been heard on the tape? Your Honor, in candor, I don't recall at this point. I know that Mr. Zitlow probably does recall, and I'm sure he can inform you on that, but I don't recall at this point. Was there anyone in the courtroom? Because there's some allegations that there's nobody there except for the jury and the parties. Sir, my recollection is that at the time I got to make the objection, there were a considerable number of people in the court. I can't tell you with any sort of photographic memory exactly how many there may have been at the point when I first put on the headphones and was unaware for those 40 minutes of the fact that it was not being broadcast over the loudspeaker. I mean, obviously I'm facing forward in general, but my recollection is there were a considerable number of people at the time I made the objection. Is the figure that we look at the 40 minutes or the 16 minutes of actual testimony? Well, Your Honor, it seems to me that the public right of access to trial is not simply limited to words on a page or verbal content. It's listed to, it extends to the entire experience of the public being in court  Are you sure about that? I mean, if nothing is taking place in the courtroom, do you think that's a structural error? I see the court's point. I think if nothing has happened, happening in the court has a point, but in fact we're sitting in a multi-defendant scenario where people are doing things, things are happening. They may not necessarily be strictly testimonial, but 16 minutes or 40 minutes in either scenario I would submit respectfully. Okay. Good. Thank you very much. Thank you, Mr. Zitlow. May it please this honorable court, my name is Ed Zitlow and I represent the appellee in the United States of America in this case. What happened at trial was Mr. Krasner on behalf of his client asked that certain things not be played during one of the first tapes in this case, specifically a reference to a prior conviction of Arturo Ramirez as well as the fact that Mr. Ramirez stated on the tape that he would kill someone for $5 to $15 if necessary. When did he make that request? During the course of the trial. You'd already prepared transcripts for use by the jury that included those portions of the tape? We redacted those transcripts on the spot, but we had the cassettes which had the full conversation. So that the technician at your direction then when you reached that point had to stop the tape or pot it down or whatever. Stop it, fast forward to the next spot and then play on. And there was no one in the courtroom and the FBI agent who was running the equipment asked should I turn on the public speaker and I said no because we didn't want to inadvertently cause a mistrial because if somehow that when he tried to fast forward or he didn't stop it in time. That's insane and disingenuous. The jury heard it. So you're saying because some... Well, the jury had headsets. Of course. So because somebody in the courtroom who had no connection whatsoever to the trial just wandering around by, curious, because they may have heard something that would have caused a mistrial, you turn off the speakers and let the jury only hear it. That's why you're saying you turned off the speakers? I turned off the speaker because I didn't want to inadvertently cause a mistrial by the jury hearing through the headsets. But they still heard it. The jury still heard it with the audience. That if you didn't stop the tape in time or for whatever reason because the headsets, well, the whole point is, Your Honor, there was no Sixth Amendment violation because the tapes and transcripts... Excuse me, stop right there. I still want to understand because I don't. I clearly don't understand what happened, nor do I understand the justification. You have directed that the speaker be unplugged or that there be no playing in the courtroom through a speaker because your concern is that the jurors who are using headphones and who will not through those headphones hear the offensive matter might hear it on the speaker? Is that what you're saying? Yes, Your Honor. So your concern is that this... But why is it not possible to minimize on the speaker in the same fashion that you can minimize with the use of the headphones? Your Honor, we're all human. I was doing the best I could at the time of trial. The request to redact came at the time of trial. The equipment does allow for that, doesn't it? You can minimize on the public speaker just as the technician minimizes through the headphones, right? Well, no, when he has to fast forward, if he didn't go to the correct spot... I'm so confused. In the tape recording, he put it in inadvertently. I assume that this machine works like most other machines. There's a couple outputs on this machine. You run the headphone input line into the one output on the back of the machine, and you run the speakers that are going into the courtroom, you run those input lines into the other output. Whatever the machine is pushing to its outputs is going to be the same whether it comes out of the speaker output or the headphone output. How do you... I just don't get that. In hindsight, Your Honor, you're absolutely correct, and it was a mistake that the government made at the time of trial. But the issue is was there a violation of the Sixth Amendment right to public trial, and there was not. The tape recordings and the transcripts were admitted into evidence as early as the pretrial conference on December 17th when defense counsel represented that they did not oppose the government's Starks motion in which the government had represented that the recording devices used were capable of recording the conversations, the operators of the recording devices were competent, the tape recordings are authentic and correct, there have been no changes in additions to or deletions from the tape recordings, the tape recordings have been properly preserved, the speakers on the tape recordings are properly identified, and the transcripts of the tape recordings accurately represent the conversations on the tape recordings and accurately identify the speakers in the parties' tape recording conversations. And in fact... The effect of what happened here is that no one in that courtroom other than those for whom headsets were provided could hear anything played on these first six tapes. Isn't that true? The first seven tapes, correct. But they could hear the testimony of Stephen Carnival who was asked... Right. In fact, what they would be hearing is live testimony from a witness, and Mr. Krasner couldn't answer my question, but I assume that I'm correct that there was, most of the time or all of the time during the playing of the tapes, a live witness on the stand. Is that correct? And the jury could hear and the public could hear all the questions that were asked of them, and the thing is... There was no context at all, because what they'd hear is a witness talking about something that they in the public sector of the courtroom had not heard. But the transcripts were available, Your Honor, to the public because they were in evidence, and all the case law, including the Ninth Circuit and the Queen, as far back as 1951, that said the use of headsets or earphones when playing tapes at trial rather than playing for all in the courtroom to hear is not a violation of the right to a public trial. And that same issue came up as recently with the Fourth Circuit in the Plummer case, which is an unpublished decision, and they also reaffirmed that same principle that... I know, but I'm published as a humbler colleague, but we jump up and down, we yell, we scream, we cry to get attorneys to realize that in our court, in our circuit, we don't put any weight in terms of precedential value into unprecedented things. Every case which is non-presidential from every other circuit that I've ever seen printed in what is now unfortunately appearing in the West Appendix has a little asterisk that says, pursuant to the rules of court, this case is not to be cited as precedential. So the fact that Plummer may have said something, I assume you're arguing that only for any kind of persuasive value it may have, but it's certainly not precedential to us. Absolutely, Your Honor, and I'm saying it's persuasive, but what I'm trying to do is point out to the court all the decisions that have addressed that issue, and the only decisions are those two decisions, the Ninth Circuit and De Quino, and then as recently this Plummer case, and the law is that they've announced is that the use of headsets and earphones when playing the tapes at trial, rather than playing for all in the courtroom to hear is not a violation of public trial. Just as the fact is that an exhibit is presented to a witness or circulated among the jury and not then circulated among the public. That's not necessary, or any other exhibits or matters that occur. And Your Honor, I get back to what you originally asked. This is a trivial matter. The point is the transcripts were there. Anyone and the court directed that the transcripts be available. This is the transcript of what happened when the speakers were turned off. Those transcripts were made available after this came to the court's attention? Yes, Your Honor, there were transcript books there, and anyone that wanted to examine those transcripts could examine those transcripts. And how soon was that after it came to your attention, to the court's attention, that the speakers weren't on? The objection was made after we returned from the lunch and recess, and as soon as that objection was made, the district court ruled that defense counsel had waived the objection by not making it earlier. And defense counsel didn't waive it, did he? Well, that's what the district court ruled. I understand that's what the district court ruled. There wasn't a waiver. There was. How do you waive something about which you know nothing? You're correct, Your Honor, but the bottom line is that the ruling of waiver was incorrect. Your Honor, I'm going to always try to support the district court. I understand you're dancing with the one that's wrong you, but is that a defensible rule? Well, the bottom line is that's what I'm getting to, is that there was no Sixth Amendment right to a public trial violation in this case because the transcripts were in evidence even at the time of the pretrial conference. Every now and then it may, and we're really lucky, and hold our breaths, it may happen sometime to the discretion to stumble upon an attorney whom, when asked a question, says either yes or no, actually gives us an answer to the question. And then if he or she wants to explain the answer, we can clearly do that. But I'm hoping that before we finish with your time today, you'll be able to say either yes or no in response to a question because answers are really good things to get every now and then. We like to have answers. That's why we ask questions. I have yet to hear you answer a question. We'll ask you a question. You will respond with an argument. But just answer the question. And then if you want to explain it with an argument, by all means do that. But just answer the question. Yes, Your Honor. Oh, got that. Good, good. It happened. Thank you. You were going to explain how the transcript, or the fact that the transcript became available, you were asked the question. After defense counsel raised this and the district court ruled, what, if anything, happened with respect to the transcript, or what was said at that time? Well, the transcripts were available to the public at all times during the trial because twice the transcripts were actually admitted into evidence. First at the December 17 pretrial conference, and then before any tape recordings were called, Michael Carlson, who supervised the wiretap, was called just to explain to the jury how the wiretap took place, how the times and dates were recorded with respect to each individual telephone conversation. All the 41 cassettes that were to be played were presented to him. He identified them. All the transcripts were presented to him. He identified all the transcripts, testified the transcripts were accurate. The government at that time moved the tapes and transcripts into evidence that was granted by the court before any tapes were played. So it was a public trial because this is not a situation where something was being kept from the public that is something that they had no right of access. In this case, the transcripts were part of the record. It's just inadvertent, Your Honor, and mistakes happen, and we're all human, and that's why I think the Supreme Court said defendants were entitled to a fair trial, not a perfect one. On hindsight, I wish I had just told you, just flip on the public speaker. I was more concerned at the time that with a four-week trial, a significant drug trafficking case involving an associate of organized crime that was getting these kilos of cocaine to flood the Philadelphia market with cocaine, that something would inadvertently happen where the jury might hear that the defendant had a prior conviction and was offering or willing to kill someone, and that was my concern at the time. That was the problem that I think we're having. The jury still heard it. It was the public. If anybody was in the courtroom, it was the public speaker that was turned off. The headphones weren't turned off. So if you're saying your concern was to guard against the jury hearing something, it seems to me what you do is you shred down the entire sound system. But what you don't do is give the jury the luxury of stereophonic sound for them to hear something that would cause a mistrial when everybody in the courtroom is not allowed to hear it. It's backwards, man. I don't get that. The district court was troubled with that explanation, too. But I think it's significant that defense counsel did not ask to have the seven tapes replayed in open court, which would have just taken up time. If that was such a concern, he could have said, well, Your Honor, we understand they weren't on the public speaker. Replayed in open court? Yes, Your Honor. Under what circumstances? Just replayed. He certainly didn't want the jury to hear them all over again. Correct. So we would have just had an open court session and just played the tapes. But they didn't ask for that because the transcript. That really doesn't replicate what had happened, does it? Because what the public isn't going to see is how, perhaps among other things, how a jury reacts to the tape that's being played. So you really haven't replicated what occurred in open court merely by replaying the tapes. There was no one in the courtroom, Your Honor. Is the record clear on that? Yes, Your Honor. I represented on the record exactly that there was no one in the courtroom. But is the record clear what you represent? You mean in the district court you represented that? Yes, Your Honor. I made a statement on the record when that was pointed out, that there was no one in the courtroom. In presence of the defense counsel, the defense counsel did not object or try to correct that. He may have his memory, but I clearly remember there was no one in the courtroom. Well, then that's not the record, Mr. Semple. You probably experienced the prosecutor. What is on the record is something that's either an established fact that's been found as fact or a stipulated fact, or there's some evidence of it, but an attorney's statement to a judge is not evidence. We can't rely upon that unless it's not objected to or unless it's consented to by the other side. That's not evidence for us. Did you state on the record that no one was in the courtroom? When those seven tapes were played, that's correct. Now, during the luncheon recess, a reporter did walk in, and those transcripts were made available to that reporter, a whole transcript book.  other than the participants. And I think what's important is what Your Honor pointed out, that we're talking about seven tapes that were played, which is a matter of approximately 16 minutes, out of a four-week trial when those transcripts were available and available to the public. This is totally different than the case that was the only decision that defendant relied upon, which was that district court opinion, where they redacted portions from the tapes, which the public never had an opportunity to have public access. That's the decision that he cites. In this case, those transcripts were there. They were there during the entire trial. The only thing that happened was, inadvertently, for whatever reason, the government made a mistake by not turning on that speaker for approximately 16 minutes. And if it was such a current concern to Mr. Ramirez, he could have asked, Your Honor, can we just have those played again in open court? It's discretion, and it's discretion. Why would any defense attorney want to have tapes played again and for the jury to hear it one more time, evidence that was incorporated to his client? What defense attorney would do that? Well, the remedy to district court, in its discretion, was the transcripts are there. The transcripts are available. I've already made the transcripts part of the record, part of the evidence, before any tapes were played. So it was public access. The cases that you cite, most of them deal with inadvertent closure. Here I don't think we can say that it was inadvertent. I think it seems to me it was deliberate. But as you say, it was mistaken, and you wish you had not done it. To the extent it was intentional, but mistaken, does that mean that these cases are not very helpful to you because they deal with inadvertent disclosure? Well, if you look at the – I don't know how to answer that yes or no, Your Honor. But I think if you look at Waller v. Georgia, it said where the suppression hearing had been closed for seven days, the Supreme Court said we have to look at what is the remedy in this case. Well, I think the district court came up with a good remedy in this case, which was the transcripts are available. Anyone can look at the transcripts. I made the transcripts part of the record, so that's a sufficient remedy for that problem that the broadcast speaker was on, as opposed to just taking up time, excusing the jury, and saying, okay, everyone sit here and we play these seven tapes again to an open courtroom and the chance that someone might walk in or out of the courtroom. So by having the transcripts available, it just moved the case along. Well, if the Supreme Court said you have to look at what the remedy is, in the Waller case the remedy was if there's a new suppression hearing and it results in a different outcome, then that might have a different trial. Well, it's the same here. It's trivial. There wouldn't have been any difference, whether they would have just replayed the tapes in open court without the jury being present so they don't hear the tapes twice, or whether it was the transcripts are here. Anyone can look at the transcripts. The transcripts are available. Mr. Zitlow was directed by the court to have the transcript books right there, so if anyone walked into the courtroom, they could have the transcript books. And so that was the remedy. So I think that's how we're guided is by the Supreme Court. Good. Thanks. Let's spend just a minute on the first issue. I think we understand it pretty well. In your experience, does the U.S. Attorney use the original tape in court, or is this? In the experience, Your Honor, I've been assisting the U.S. Attorney for 25 years, and I remember, Your Honor, from district court. That's how far back I think we've both been. I remember you from back then, too. You're just as good looking now as you were. There's the chief. He and I disagree. Smith's saying that because he doesn't want to get the writing in his hand. We use the duplicates because, as the Rivera case said, the use of the duplicates allows the original tapes to remain sealed, preserving the authenticity of the original tapes. In this case, Your Honor, this was a state court wiretap where we adopted some of the defendants for prosecution and leaving some of the lower level defendants for state prosecution. There was also an organized crime feature to this case. Excuse me. As a matter of your office practice, don't you always use a copy? Yes, Your Honor. Okay. Good. Any other questions? Good. Mr. Zitlow, thank you very much. Thank you, Your Honor. All right. Members of the board, I don't know how much time I have. I'm happy to answer any questions. We'll give you five minutes you asked for. Yes, let's just start with the last point we closed on. I was trying in my mind to imagine how it would work in the typical case if your argument on the original sealing was to prevail. And as you probably know, in the typical case, you've got hours and hours and hours of conversations, tens if not hundreds of cassettes. And you've got two minutes on one cassette, maybe 70 minutes on another cassette, four minutes on another cassette that you've got that's irrelevant. The rest is just talking about the ballgame or no conversation pertinent to the prosecution. If you're right, how would you do it? How would you use the original sealed? You come into court with the original sealed, not copy copies. Maybe I'll say you've got 100 cassettes, which is not nearly as many as most of these cases are going to have, but let's limit it to 100. You've got 100 cassettes, all of them sealed, and you've got the agent has identified where on each cassette the evidence that the government wants to submit can be found. How do you do it? What's that trial look like? Judge, respectfully, I think it's very simple. They would do exactly what they did here. It's just that they would have to source everything that they produced in court off of the sealed original. They would go to the court who sealed the original. The court would grant an order. Are you saying they wouldn't have to play the sealed original? I'm saying that they would not have to play the sealed original. They have to source everything off of the sealed original. And in fact, if you look at the language of the statute, it talks about how you have to have a seal or a satisfactory explanation. I think that's what they're talking about here. That gets back to what you were saying earlier about you want them to make one original and then make copies from that original. I would say they have to go off the integrity side of this. They can't go off. Why didn't you waive this at the Starks hearing? I'm sorry, sir. Why didn't you waive this at the Starks hearing where you stipulated to the authenticity? A few minutes ago, I asked you about the authenticity of the copies. You said you had no way of knowing. But according to Mr. Ziplot, well, you stipulated that at the Starks hearing, and he had you not stipulated to it at the Starks hearing. We have a very different Starks hearing. Judge, my recollection is that I believed that everything was coming off of the sealed original. I became aware that it was actually coming off of duplicates that had never been sealed, had never been part of any sort of integrity process somewhere during the course of the litigation. Because we don't have much time, we've got another issue that's going to be more important. How do you define original? Let's start with that. Give me your definition of an original tape and tell me why, given the way these tapes were made, they weren't also originals, just duplicate originals. Well, Your Honor, the way the Wiretap Act talks about it, it talks about a sealed original, which is really what I'm talking about. I mean, I understand the court could say that all three are original in the sense that they are coming off of some sort of... Well, why aren't they? They're all made from exactly the same sound waves. You've got one set of sound waves going into the microphone. Whatever happens within that machine to imprint magnetically on the tape, the pattern of those sound waves, so they can later retrieve it through a loudspeaker and an amplifier, those sound waves are going into all of the tapes at exactly the same time, having exactly the same magnetic repercussions on the tape, exactly at the same time. Why aren't they all originals? I can't differ with that. However, what we're talking about is whether they're sealed originals. And what we're also talking about is what happens to that original or duplicate original or whatever language may be used. And Mr. Zitlow, in fact, did use the phrase duplicate and duplicate original throughout the litigation. The issue is not so much how pristine are these tapes the moment that they're taken. The issue is how do we preserve their integrity when you take two of those sets, you turn them over to law enforcement with absolutely no protection. And finally, I would just note this, if I may, for the Court, which is that we can talk about, with reference to the other issue, the issue of the public access,  things being open, things being the public having a right of access. But obviously, the Court has correctly addressed the point that being able to reconstruct at some later time by getting access to a book of tapes at some later time is a totally different experience of public access than understanding while the matter proceeds what is occurring. So if there's a closure, then it's a structural error and there has to be a new trial. Under these circumstances, sir, where it's not inadvertent, under these circumstances where it was extended, under these circumstances where the government did nothing to try to remedy it, under these circumstances... Well, hold on a second. What should the government have done to remedy it? Well, one thing we could have done is we could have started the trial over. Another thing that we could have done... That's a mistrial. Other than a mistrial, what else? What about playing the tapes over again in open court? Would that have been the right, correct remedy? I think I would have objected to that. Why? Because it would have created a scenario in which certain tapes are being reinforced over and over again. Okay, so that's not a remedy in your view. So other than a mistrial, what's the remedy? Mistrial is the remedy, sir, under these circumstances. And did it make any difference whether anyone was in the courtroom or not? Well, sir, honestly, it's very hard for me to imagine a scenario in which someone wasn't because that trial... Okay, let's assume that there weren't. But does that make a difference legally? I would submit it does not because there was still a lack of access. And anyone who would have walked in at any point would have not been able to witness the proceedings as they were occurring. It's a right of access, and it's not actually a question of whether or not a particular person was there. Having said that, we're talking about a four-week trial in which people drifted in and out all the time. I don't know how, since I couldn't see out the back of my head, my opponent is so confident that there was nobody in that courtroom the entire morning. Well, if he in fact made that statement on the record, all you had to do was turn around and look and say, no, there's people here. Your Honor, the point at which it was raised was the point at which I became aware of it. I became aware of it over the lunch break. I came in, immediately raised the point. At that point, I looked around, and there was an abundance of people in the courtroom. All right. That's a fact. Yes, okay, so it was not raised at that time. I understand. So when Mr. Zillow represented, maybe I misunderstand what he's saying. When he represented to the district court that no one had been in the courtroom during the time the lodge speakers were off, did you object or take issue with that on the record then? Your Honor, my belief is I did take issue with that at that time. I can't, at this point, tell you exactly when and where, but my recollection is I did take some sort of issue with that. Two questions. Yes, sir. In response to Chief Judge Sirica's question about remedy, you said mistrial was the remedy. Is my recollection correct that you also alternatively suggested that in the absence of a mistrial, that the evidence be stricken? Did you also ask that? I seem to have some recollection from reading the record. Judge, your recollection is better than mine. All right. Secondly, the point in time when Mr. Zillow stated on the record that there was no one in the courtroom, that would have been a snapshot of what the case was at that point in time? Is that correct? Your Honor, I don't know what else it could be, because just as he seemed to think what he was doing was fine, I was unaware of it occurring, so I don't know how he could have been staring at the courtroom for that. During the period of time that the seven tapes were played, which may have been as much of an hour, there were or at least could have been people in and out of the courtroom. Is that the situation? The most candid thing I can say is I am virtually certain there were. But there's nothing in the record one way or another. I think there's a dispute in the record. And Carnival, he was a key witness? Carnival was a very key witness. All right. Good. And how long did he—he was on the stand? It was a period of hours, sir. I can't tell you exactly how many. All right. What do you do with Mr. Zitlow's analogy to exhibits that are published to the jury but the courtroom never sees them, spectators in the courtroom never see them, especially in a documents case, where the entire case may rest on documents. It's a mail fraud case. The entire case rests on statements that are made in certain mailings that are published to the jury, but the courtroom has never shown the— the courtroom has never shown the exhibits. Why wouldn't that be tantamount to a denial of free access if your argument prevails? Why wouldn't that proceed to be unconstitutional? Well, first of all, these aren't documents. The power of a tape and its impact is really very different. It is the same thing, though. You're saying that there wasn't access to something that occurred in the courtroom when the loudspeakers were turned off. Yes, sir. And why isn't there access, given Mr. Zitlow's analogy, which when he said it struck me as a fairly powerful argument that I hadn't thought of, why isn't it analogous to a situation where documents are published to the jury but not shown to the spectators in the courtroom? Why isn't that a denial of access to the public? Well, Your Honor, I think I would have to revert to saying that this is far more in the nature of testimony. It is far more in the nature of an actual recordation of the human voice expressing both emotionally and verbally a thing. So you're saying the right of access really only goes to oral testimony? No, sir. I'm trying to say that this is distinguished from those cases in that sense. I'm not so sure those cases are right, sir, but that's also not my job. It seems to me that if we're going to have a right of public access to trial, then the public has to be able to know what is going on, and that would extend to documents. So documents, unless documents are somehow posted or made available to spectators in the courtroom, we don't have a proper right of access. That would be my opinion, sir. I'm not here to argue that it's a legal proposition, but that would seem to me to make sense. If you were writing this opinion, and let's say you persuaded it, at least two of us, that you're right on this public access thing, how would an opinion be written that wouldn't raise to call into question a process where documents are published to the jury and not shown to the courtroom? How could you get around that problem? Well, sir, again, it seems to me that there is a very great distinction between the power and the impact of a recording of a verbal communication which is inculpatory or allegedly inculpatory. So we would have to assess the adversarial value, the strength of the evidence in a document vis-à-vis the strength of the evidence of a… Your Honor, I think it's in the nature of testimony. Documents can be more inculpatory. They can, sir. In fact, they usually are. They can, sir. But we're looking at this in the context of public access to trial. And in the context of public access to trial, I would submit respectfully to what you're doing is you are effectively playing the testimony of a witness, even if he happens to be the defendant. You're playing words from his mouth as they are given. But it does require us to assess the reaction the jury would have to the testimony. What if you had, let's say, a bank robbery, and you have a jurisdictional witness up who's talking about how this bank is insured by the Federal Deposit Insurance Corporation to establish the federal jurisdiction, and that oral testimony is not published? Now, clearly, that goes to the very heart of the case. It goes to whether or not the federal court has any power to even entertain this conviction. But I couldn't imagine the jury is going to be very, very taken by that oral testimony. Why would that oral testimony be weightier than a document that might be published to the jury? Let's say a demand note that has purportedly writing on it that a witness later on is going to come in and say, this is the defendant's writing on this demand note. Well, it's not always. I mean, the scenario the court has rendered is one in which, in fact, that note is more dramatic than any number of tapes might be. So I see the court's point in that respect. Nevertheless, we are in a time when technology has changed to a point where if you walk down to City Hall, they have a high-tech courtroom with all sorts of screens. It is now actually very easy to have exhibits displayed for everyone in the courtroom. And I don't even mean just having a book available for them to see, which, frankly, I almost never see anyway when I try cases. I mean putting it up on the wall, putting it up so it's visible. We are in a period and an era when it shouldn't be a problem for documents to, by one means or another, technologically be shown to the entire courtroom, as well as being shown to the jury. And it may be that that would be an appropriate capability to take into account in looking at the issue of public access in reference to documents. Anything further? Good. Thank you very much. Thank you, sir. The case was well argued. We'll take the matter under advisement.